Reynaldo AGUILAR–SOLIS, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–1484.

United States Court of Appeals, First Circuit.

Heard Dec. 10, 1998.

Decided Feb. 26, 1999.

---

Vincent J. Cammarano for petitioner.

Elizabeth A. Welsh, Senior Litigation Counsel, Office of Immigration Litigation, United States Department of Justice, with whom Frank W. Hunger, Assistant Attorney General, Civil Division, and Mark C. Walters, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

Before SELYA, Circuit Judge, GIBSON,* Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

Reynaldo Aguilar–Solis (Aguilar), an El Salvadoran national, solicits judicial review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum and withholding of deportation. He claims that the hearing officer's heavy-handedness abridged his right to due process, that the BIA's rejection of his application lacked record support, and that Congress's enactment of the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Pub.L. No. 105–100, 111 Stat. 2193 (Nov. 19, 1997), as amended by Act of Dec. 2, 1997, Pub.L. No. 105–139, 111 Stat. 2644, calls into constitutional question the BIA's disposition of his case. Finding these arguments unpersuasive, we uphold the BIA's order.

## I. BACKGROUND

The petitioner claims that he fled to the United States from his native land in 1985 to avoid persecution on account of his (and his family's) political views.[1] Instead of seeking political asylum immediately after his illegal

* Hon. John R. Gibson, of the Eighth Circuit, sitting by designation.

1. The record indicates that the petitioner gave conflicting accounts about his original entry date, raising the possibility that he entered the United States for the first time in 1980 or 1982, rather than in 1985. Although we need not resolve these seeming contradictions, we regard them as germane to the issue of the petitioner's credibility.

entry, the petitioner knowingly purchased a bogus social security card and parlayed it into a driver's license and, ultimately, employment. At some point, he met a woman (also an illegal alien from El Salvador) and returned home with her in December 1990 to be married. Prior to departing, the petitioner paid $3,000 to buy a fake temporary resident alien card, notwithstanding his present insistence that the couple intended to reside permanently in El Salvador.

During the petitioner's nuptial stay, friends and family allegedly informed him that members of a guerilla organization, the FMLN, were making inquiries. He testified that these warnings precipitated his abrupt return to the United States. Immigration officials apprehended him at the Miami International Airport in February 1991 as he attempted to enter the United States by using the fraudulent card. Instead of seeking asylum, he elected to withdraw his application for entry. He thereupon returned to El Salvador and, the following month, made a surreptitious border crossing near San Diego, California. He then paid to have his bride smuggled into the country.

Some four years later, the Immigration and Naturalization Service (INS) apprehended the petitioner and began proceedings to deport him on the ground that he had entered the United States illegally.[2] *See* 8 U.S.C. § 1251(a)(1)(B). The petitioner conceded deportability, but requested political asylum and withholding of deportation or, in the alternative, voluntary departure. At the conclusion of the hearing, the Immigration Judge (IJ) issued an adverse bench decision. The petitioner sought review, arguing that the IJ's conduct at the hearing violated his right to due process and that the evidence mandated a grant of asylum. In a per curiam opinion, the BIA rejected both contentions.

## II. ANALYSIS

We address in sequence the petitioner's claims that the BIA erred (i) in its condona-

tion of the IJ's conduct, and (ii) in its denial of his asylum claim. We then turn to the petitioner's blunderbuss constitutional challenge (raised for the first time in this venue).

### A. *Fairness of the Hearing.*

■ The petitioner argues that the IJ's handling of his case compromised the fundamental fairness of the hearing. Specifically, he asserts that the IJ cross-examined him, interrupted his testimony, and suggested lines of inquiry to the INS's attorney. This course of conduct, he says, prevented him from building a consistent, detailed evidentiary record and reflected an impermissible bias. We review the question of whether an administrative law judge's conduct violates a party's due process rights de novo. *See Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir.1996); *Hartooni v. INS*, 21 F.3d 336, 339 (9th Cir. 1994).

■ We have carefully examined the hearing transcript and find no constitutional infirmity. An immigration judge, like other judicial officers, possesses broad (though not uncabined) discretion over the conduct of trial proceedings. *See Iliev v. INS*, 127 F.3d 638, 643 (7th Cir.1997); *cf. Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir.1997) (discussing discretion possessed by federal district judge). During the three-day hearing in this case, the IJ appears to have used that discretion suitably and to have provided the petitioner with every opportunity to make his case.

To be sure, the IJ attempted to move things along by preventing repetitive testimony and encouraging the parties to stipulate to undisputed facts. In doing so, however, she imposed no unreasonable restrictions on the petitioner's presentation of either testimonial or documentary proof. Moreover, she afforded each witness (the petitioner included) the opportunity to testify fully and

---

**2.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, Div. C, 110 Stat. 3009–546, substantially revised the Immigration and Nationality Act. However, IIRIRA's transitional rules give continued vitality to several sections of the prior law where, as here, deportation proceedings were commenced prior to April 1, 1997. *See id.* § 309, 110 Stat. 3009–625. Since Aguilar's case falls within this safe harbor, we cite directly to the earlier statutory version.

facilitated the petitioner's efforts to reconcile conflicting answers that he had given in three separate asylum applications.

The petitioner's complaints that the IJ interrupted his testimony and cross-examined him do not withstand scrutiny. The record reveals that the IJ interrupted only to clarify responses or to return strayed questioning to a relevant line of inquiry. A judge who plays an active, but even-handed, role in keeping the focus of the inquiry sharp is to be commended, not condemned. *See Logue*, 103 F.3d at 1045. By like token, the IJ's cross-examination was wholly consistent with the requirements of the Immigration and Nationality Act (the Act). *See* 8 U.S.C. § 1252(b) ("The immigration judge shall ... receive evidence, interrogate, examine, and cross-examine the alien or witnesses.").

 We do not mean to suggest that the Act relieves immigration judges of their responsibility to function as neutral and impartial arbiters. Notwithstanding the statutory directive, immigration judges must assiduously refrain from becoming advocates for either party. Here, however, the IJ's neutrality cannot seriously be doubted. Even if viewed through a jaundiced eye, the transcript reflects nothing more sinister than a modicum of impatience. This is not the stuff from which a due process violation can be fashioned. *See Liteky v. United States*, 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (holding that charges of judicial bias and partiality cannot be established solely by "expressions of impatience, dissatisfaction, annoyance, and even anger"); *Logue*, 103 F.3d at 1045 (similar).

 To say more would be supererogatory. The short of it is that the IJ conducted the proceedings in this case in a balanced, thoroughly professional manner. No more is exigible: a party to an immigration case, like any other litigant, is entitled to a full and fair hearing—not an idyllic one.

**B. Asylum.**

 Before us, the petitioner does not press for voluntary departure, but, rather, seeks political asylum and withholding of deportation. We need discuss only the asylum claim.[3]

As a prerequisite to asylum eligibility, an alien bears the burden of establishing that he is a refugee. *See* 8 U.S.C. §. 1158(b)(1); 8 C.F.R. § 208.13(a). The Act defines "refugee" as a person who cannot or will not return to his country of nationality or avail himself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The IJ concluded that the petitioner failed to establish either past persecution or a well-founded fear of future persecution on account of one of the five enumerated grounds, and the BIA concurred.

 The BIA's decision must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). The Supreme Court has interpreted this deferential standard to permit reversal of a BIA decision on sufficiency grounds only when the record evidence would compel a reasonable factfinder to make a contrary determination. *See INS v. Elias–Zacarias*, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). For purposes of this case, the *Elias–Zacarias* standard signifies that, if the petitioner is to prevail, the administrative record, viewed in its entirety, must *compel* the conclusion that he is asylum-eligible. We conclude that the evidence falls far short of this target.

 **1. *Past Persecution.*** Congress has not defined the term "persecution" and the courts thus far have failed to achieve a general consensus on its meaning and scope in this context. Generalities abound. We

---

**3.** The standard for a grant of asylum is easier to meet than that for nonrefoulment (withholding of deportation); asylum eligibility only requires a well-founded fear of persecution, *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1), while withholding of deportation requires a clear probability of persecution, *see* 8 U.S.C. § 1253(h). Because the petitioner fails to vault the lower hurdle, *see* text *infra*, we need not deal with the nonrefoulment question. *See, e.g., Ipina v. INS*, 868 F.2d 511, 515 (1st Cir.1989).

know, for example, that persecution encompasses more than threats to life or freedom, *see INS v. Stevic,* 467 U.S. 407, 428 n. 22, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), but less than mere harassment or annoyance, *see Balazoski v. INS,* 932 F.2d 638, 642 (7th Cir. 1991). Between these broad margins, courts have tended to consider the subject on an ad hoc basis. *See, e.g., Marquez v. INS,* 105 F.3d 374, 379 (7th Cir.1997).

This case does not require that we etch a more precise configuration. Even if we assume, for argument's sake, that the acts alleged here could fall into the elusive realm of "persecution," the record supports the IJ's multi-pronged finding that the petitioner's credibility was impaired and that his evidence, to the extent credible at all, lacked the specificity required to establish the requisite nexus between the alleged acts and one of the five statutorily protected grounds.[4]

We turn first to the proof. In support of his claim of past persecution, the petitioner testified to the following. His family owned a plantation in Chalatenango. During the civil war that rocked El Salvador from 1979 to 1992, the region became a stronghold for the FMLN—a left-wing insurgent group that aspired to topple the national government. Until his death in 1982, the petitioner's father managed the family farm and also dabbled in local politics. His membership in a series of political parties (most notably, the ARENA party) placed him on the opposite end of the political spectrum from the FMLN. There is no evidence, however, that the petitioner (or any family member other than his father) was more than marginally involved in political activities or held office in any political organization.

Despite this lack of personal involvement, the petitioner contends that the FMLN targeted him and his family, even after his father's death, for special attention. According to his account, the first sign of harassment occurred in 1980 when FMLN guerrillas took him, his older brother, and several

others into the woods and attempted to recruit them. The petitioner responded neutrally to the recruitment effort, stating only that he would think about it. No one was threatened or physically harmed. During the early 1980s, the petitioner's family received numerous threats (from unspecified sources), but these also came to naught.

In 1982, the government encouraged formation of local groups, which came to be called the Civil Defense Patrol (CDP), to defend against the guerrillas. The local branch of the CDP comprised 15 to 20 members. The petitioner's older brother commanded the unit and the petitioner served in it. According to the petitioner, the CDP engaged the guerrillas in several armed confrontations between 1982 and 1984 (at which time the guerrillas seized firm control of the region and the CDP disbanded).

Concerned about their safety, the petitioner's family temporarily moved to the capital, San Salvador. Thereafter, they lived in both regions, shuttling back and forth from San Salvador to Chalatenango. During this nomadic period, the family home in Chalatenango was destroyed, although the record contains no clear indication as to when, how, why, or by whom. Finally, in 1985, FMLN guerrillas ambushed a truck which the petitioner's older brother was driving from San Salvador to Chalatenango, and killed him. At that point, the petitioner fled the country.

The petitioner maintains that this evidence, virtually all of which comes from his own mouth, demanded a finding of past persecution. We do not agree. We recognize, of course, that "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). This does not mean that a reviewing court must take every applicant's uncontradicted testimony at face value, for testimony sometimes is internally inconsistent or belied by the prevailing circumstances. Furthermore, a witness's demeanor is often a critical factor in determin-

---

4. For ease in reference, we discuss the IJ's findings, mindful that in contemplation of law they have become the BIA's (as is true whenever the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and proceeds to adopt the IJ's findings and conclusions). *See, e.g., Surita v. INS,* 95 F.3d 814, 819 (9th Cir.1996); *see also* 8 U.S.C. § 1105a(a)(4).

ing his veracity. *See Cordero–Trejo v. INS,* 40 F.3d 482, 491 (1st Cir.1994). And when a hearing officer who saw and heard a witness makes an adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect. *See Nasir v. INS,* 122 F.3d 484, 486 (7th Cir.1997); *NLRB v. Horizons Hotel Corp.,* 49 F.3d 795, 799 (1st Cir. 1995). While the obligation to defer should not be confused with an obligation to rubber-stamp the hearing officer's credibility call, such a determination merits judicial approbation as long as the findings on which it rests have sufficiently sturdy roots in the administrative record.

This is such a case. In making her credibility judgment, the IJ emphasized the petitioner's acquisition of an ersatz temporary resident alien card in 1990 and the improbability of his claim that he did not know the card was bogus. She also pointed out that the circumstances surrounding the purchase belied the petitioner's story: he obtained the card through a Brazilian intermediary whose last name he professed not to recall, never stepped foot in a government office, paid $3,000 in cash for the document, and traveled from Boston to Miami to procure it. Moreover, the timing of this illegal purchase undermined a second aspect of the petitioner's tale: he claimed that he had intended a permanent return to El Salvador in 1990—but this claim does not jibe with the significant investment he made in fraudulent documentation just prior to his departure.

These, and other, inconsistencies—such as the petitioner's admitted purchase of fraudulent documentation on an earlier occasion, the factual variances between the petitioner's second and third asylum applications, and his changing stories about when he first entered the United States, *see supra* note 1—coupled with the absence of plausible explanations for the incongruities, amply justified the IJ's conclusion that the petitioner's testimony lacked credibility.

An asylum applicant must carry the devoir of persuasion as to his eligibility. *See* 8 C.F.R. § 208.13(a). To the extent that the petitioner's testimony about what had occurred in the 1980–1985 time frame could be credited, the IJ supportably found that it lacked the requisite degree of specificity to sustain the petitioner's burden of proof. In particular, the vague evidence of alleged persecution that the petitioner adduced failed to establish a sufficient nexus between the events that he described and any ground enumerated in 8 U.S.C. § 1101(a)(42)(A).

On the petitioner's version, when the FMLN attempted to recruit him in 1980, he never divulged his political leanings, and the guerrillas expressed no awareness of them. Thus, the incident is not significantly probative. *See Elias–Zacarias,* 502 U.S. at 482, 112 S.Ct. 812 (holding that "the mere existence of a generalized 'political' motive underlying the guerillas' [actions] is inadequate" to establish persecution on account of political opinion). This is especially important because the record contains no evidence, subsequent to the 1980 incident, of any harassment that is even arguably linked to the petitioner's political views.

The petitioner's father's participation in, and personal support for, ARENA—a political party in ideological opposition to the FMLN—does not trip the balance. While the IJ might have drawn an inference that the FMLN targeted the petitioner because of his membership in a social group (i.e., his family), she chose to draw a contrary, equally plausible inference. Such choices are a factfinder's prerogative. Where, as here the constellation of facts and circumstances alleged by an asylum applicant, together with the other record evidence, supports two or more competing inferences, the IJ's choice among those inferences cannot be deemed erroneous. *Cf. 3–E Co. v. NLRB,* 26 F.3d 1, 3 (1st Cir. 1994) (explaining that a reviewing court will not disturb an ALJ's credibility determination "so long as [it] represents a choice between two fairly conflicting views"). A fortiori, the record does not compel a conclusion that the guerrillas persecuted the petitioner because of his family status.

The petitioner next adverts to his service in the CDP from 1982 to 1984. He

suggests that this assignment marked him, in the guerrillas' eyes, as a political adversary. By his own testimony, however, the CDP's exclusive function was to protect citizens from guerrilla attacks. Danger resulting from participation in general civil strife, without more, does not constitute persecution. *See Martinez–Romero v. INS*, 692 F.2d 595, 595–96 (9th Cir.1982); *Matter of Rodriguez–Majano*, 19 I. & N. Dec. 811, 816 (BIA 1988). The petitioner introduced no evidence about the motivation behind these attacks, and without some proof that the guerrillas were attempting to harm or oppress the townspeople on account of their political opinions, the record cannot conceivably compel a conclusion that enlistment in the CDP subjected its members to politically-inspired persecution.

Finally, the petitioner contends that the anonymous threats that he received from time to time signaled his own jeopardy, and that his peril escalated upon the slaying of his older brother. Danger is one thing, but cause and effect is a quite different concept. On the record as it stands, there is nothing that forges an inexorable link between either the threats or the murder and political opinion. As to the former, the IJ plausibly suggested that, given the substantial land holdings of the petitioner's family, such threats, if received at all, could just as easily have represented attempts by the guerrillas to garner financial support for their movement. As to the latter, the decedent's role as commander of the CDP might well have aroused in certain FMLN members a personal animosity that accounted for the attack. In short, while the petitioner's (and his older brother's) political opinions *may* have played a part in these untoward incidents, the record does not mandate a finding to that effect.

We need not add hues to a rainbow. The IJ viewed the petitioner's evidence of past persecution through a prism of warranted dubiety and found it inadequate. We cannot say that this determination was clearly wrong or, put another way, that the evidence compelled a finding that the petitioner had suffered past persecution on account of his (or his family's) political views.

◼ 2. *Well–Founded Fear of Persecution.* A second way in which an alien may establish asylum eligibility is by demonstrating a well-founded fear of future persecution. Even setting the petitioner's damaged credibility to one side, his evidence on this issue is insubstantial and contradicted by significant proof of changed country conditions.

◼ The standard for proving a well-founded fear of future persecution contains both subjective and objective components. *See Alvarez–Flores v. INS*, 909 F.2d 1, 5 (1st Cir.1990). That is to say, the asylum applicant's fear must be both genuine and objectively reasonable. *See id.* Because we find it dispositive, we focus primarily on the reasonableness prong.

◼ The degree of probability required to establish the objective component of a well-founded fear of persecution is somewhat less than the classic "more likely than not" formulation. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 450, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Beyond a tentative suggestion that a "reasonable possibility" of persecution may capture the essence of the legal standard, *id.* at 440, 107 S.Ct. 1207, the Court has not been markedly more precise. The BIA and many courts of appeals (including this court) narrow the relevant inquiry to whether a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground. *See Novoa–Umania v. INS*, 896 F.2d 1, 2, 3 (1st Cir.1990); *Carcamo–Flores v. INS*, 805 F.2d 60, 68 (2d Cir.1986); *Guevara Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir.1986); *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 445 (BIA 1987). Viewed against this backdrop, the IJ's determination that the petitioner failed to show a well-founded fear of future persecution passes muster.

Changed country conditions often speak volumes about the objective reasonableness of an alien's fear that persecution lurks should he return to his homeland. *See, e.g., Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995). So it is here: the evidence indicating that conditions in El Salvador have stabilized is highly persuasive, and the BIA's conclusion that this proof outweighed the petitioner's conclusory assertions of continu-

ing danger is therefore supported by substantial evidence.

The record demonstrates unequivocally that El Salvador's civil war ended over six years ago, when the United Nations (U.N.) brokered the peace accords of 1992. The petitioner's self-proclaimed nemesis, the FMLN, metamorphosed into a legitimate political party at that time. State Department reports indicate that, by 1995, the drumbeat of politically motivated murders had become inaudible—so much so that the Security Council withdrew the U.N.'s observer mission. These developments reflect a direct (and radical) change in the circumstances that the petitioner alleges led him to bolt.

In rebuttal, the petitioner offers more cry than wool. He points first to the vague threats that his family and friends relayed to him during his 1990 return to El Salvador, and speculates that members of the FMLN still sought to harm him at that time. This is unabashed surmise. Equally as important, because these events antedated the 1992 peace accords, their relevance has been marginalized by the intervening changes.

With respect to post-peace accords evidence, the petitioner hawks six loosely related items: (i) conclusory testimony elicited from his sister, a United States resident since 1988, to the effect that peril awaits him in El Salvador, and (ii) a compendium of five letters sent to him by persons still living in El Salvador. We have reviewed these materials and find them inconsequential; neither the testimony nor the correspondence contains specifics as to the nature of any danger, the identity of any potential malefactors, or the reasons why people might wish to harm

the petitioner.[5] Moreover, the sister's testimony is rank hearsay (she, herself, has not been in El Salvador for over a decade), and the source of the letter-writers' knowledge is obscure. Unverified statements such as these are entitled to very little weight in the asylum calculus.

Two additional considerations drive home the frailties of the petitioner's proof.[6] First, the petitioner has another sister and two other brothers who continue to live tranquilly in El Salvador, and have done so throughout the duration of his expatriation. The petitioner has not provided a satisfactory differentiation of his situation from that of his siblings. Without some explanation, the fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return. See Cuadras v. INS, 910 F.2d 567, 571 (9th Cir.1990); Matter of A–E–M–, Int. Dec. 3338 (BIA 1998) (en banc). Second, the political party with which the petitioner alleges affiliation, ARENA, convincingly prevailed in the 1994 national elections and remains in control of the government. Although action by non-governmental entities can constitute persecution, see, e.g., Velarde v. INS, 140 F.3d 1305, 1311–13 (9th Cir. 1998), the law requires at least some showing that the alleged persecutors are not subject to the government's control, see Llana–Castellon v. INS, 16 F.3d 1093, 1097–98 (10th Cir.1994). In this instance, the record is barren of any indication why a presumably friendly government would be unable to protect a returning Aguilar from fringe renegades.

5. To the extent that the letters hint at any reasons for continuing danger, they suggest increased crime and lingering personal animosities. Neither of these concerns connect the petitioner's fear to one of the statutory grounds.

6. There is arguably a third such consideration. BIA precedent holds that when the alleged persecutor is a non-governmental force, a well-founded fear of persecution is to be gauged on a country-wide basis, not on the basis of problems that are endemic to particular locales. See Matter of C–A–L–, Int. Dec. 3305 (BIA 1997) (en banc). Here, State Department reports confirm that the peace implementation process has been

faster and more complete in some regions than in others, and no record evidence supports a conclusion that the petitioner could not relocate safely to another region within El Salvador (say, San Salvador). However, the courts have not readily accepted the BIA's country-wide analysis. See, e.g., Singh v. Ilchert, 63 F.3d 1501, 1510–11 (9th Cir.1995) (finding that an applicant is not required to demonstrate a country-wide fear of persecution to establish asylum eligibility, at least after he has demonstrated past persecution). We need not resolve the question today, as the BIA's disposition of this case is fully supportable without any consideration of whether the petitioner's fear is locality-specific.

To sum up, the IJ found that the petitioner's meager basis for fear of future persecution failed to refute the overwhelming record evidence of changed country conditions. Because substantial evidence supports this finding, it deserves our approbation. In turn, this finding renders the petitioner ineligible for a discretionary grant of political asylum.[7]

## C. The Constitutional Challenge.

 The last matter to which we must attend concerns the petitioner's newly minted challenge to the constitutionality of NACARA. NACARA § 202 permits certain deportable aliens from Nicaragua and Cuba to apply for adjustment of status, and section 203 affords certain Guatemalans, Salvadorans, and Eastern Europeans applying for suspension of deportation the benefit of the pre-IIRIRA rules for calculating physical presence in the United States. Congress explained that it was providing this particularized relief to (i) classes of aliens who had taken unusual risks in escaping from oppressive governments, and (ii) those whose countries had been profoundly ravaged by war. See 143 Cong. Rec. S12261–62 (daily ·ed. Nov. 9, 1997) (statement of Sen. Abraham).

The petitioner conclusorily condemns the legislation on four grounds: (1) that the Act violates the Equal Protection Clause; (2) that it deprives persons of liberty without due process; (3) that it abridges speech and assembly in contravention of the First Amendment; and (4) that it contravenes the Constitution's Ex Post Facto proscription. The petitioner fails to develop these arguments. He likewise fails to connect the legislation to his asylum application in even the most rudimentary way or to indicate how he has standing to raise the claims that he advances.

This scattershot assault, wholly unsupported by coherent argumentation, can be rejected out of hand. See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir.1997) (explaining that this court has "steadfastly deemed waived issues raised on appeal in a

perfunctory manner, not accompanied by developed argumentation"); Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir.1990) (similar). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990). Consequently, we need go no further.

*The petition for review is denied and the BIA's order is affirmed.*

---

7. Because the petitioner harbored no objectively reasonable fear of future persecution, we need not comment upon the subjective component of the petitioner's fear. We note, however, that the petitioner's own actions—particularly his voluntary return to El Salvador in 1990—and his diminished credibility have rendered suspect his testimony about his state of mind.