# United States Court of Appeals
## For the First Circuit

No. 03-1538

JEAN RANDAL ROMILUS,

Petitioner,

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Circuit Judge,

Rosenn,[*] Senior Circuit Judge,

and Howard, Circuit Judge.

Ilana Greenstein, Jeremiah Friedman, Harvey Kaplan, Maureen O'Sullivan, and Kaplan, O'Sullivan & Friedman, LLP, on brief, for petitioner.
Peter D. Keisler, Assistant Attorney General, Civil Division, David V. Bernal, Assistant Director, Office of Immigration Litigation, and Jamie M. Dowd, Attorney, Office of Immigration Litigation, Civil Division, on brief, for respondent.

September 14, 2004

_____

[*]Of the United States Court of Appeals for the Third Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Jean Randal Romilus, a native and citizen of Haiti, petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying him asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").  We deny the petition.

## I.      Background

Romilus, a farmer from the village of Ghantier, attempted to enter the United States with a falsified passport on March 5, 1999.  The INS issued a Notice to Appear, charging Romilus as removable under 8 U.S.C. §§ 1182(a)(6)(C)(i) and 1182(a)(7)(A)(i)(I).[1]  Romilus admitted the factual allegations in the notice and conceded removability, but sought relief in the form of asylum and withholding of removal under the Immigration and Nationality Act ("INA").  He also applied for relief under Article 3 of the Convention Against Torture.[2]

The basis for the claims is persecution on account of political opinion.  In hearings before the Immigration Judge

---

[1]In March 2003, after removal proceedings were initiated in this case, the relevant functions of the Immigration and Naturalization Service ("INS") were reorganized and transferred into the new Department of Homeland Security.  For ease of reference, we continue to refer to the agency as the INS.

[2]The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, signed and ratified by the United States, was implemented by the Foreign Affairs Reform and Restructuring Act of 1998 § 2242, Pub. L. No. 105-277, Div. G., 112 Stat. 2681-761 (1998) (codified at 8 U.S.C. § 1231).  Article 3 prohibits states from returning individuals to other states where there are substantial grounds for believing they would be tortured.

("IJ"), Romilus testified about four incidents in support of his claims. The first two incidents involved an oral agreement he made in 1992 with Jean Marie, a military officer, to care for Marie's cow in return for an equal share of the profits from the sale of the cow. Marie's later failure to share the proceeds was followed by two physical confrontations between the two men, with Marie initiating physical contact on both occasions. Romilus has had no confrontations with Marie since then.

The third incident occurred in 1997. Romilus testified that armed men dressed in civilian clothes broke into his house while he and his wife were asleep. The armed intruders pointed a gun at his wife and demanded that she give them money she had earned as a street vendor. One of them demanded that Romilus hand over the money, also at gunpoint. Fearing for his life, Romilus surrendered the money he had hidden under his pillow. The armed men took the money and left.

The fourth incident involved a grassroots community organization called the Organization for the Progress of the Young People ("OPJP"). Romilus joined the OPJP in 1998 and was made a delegate of the organization. The OPJP consisted of 15 founding members, all from Ghantier, and was led by a man named Louis Blaise. According to Romilus, the OPJP is a "progressive movement for young people seeking to make democratic changes in Haiti," and its goals include improving the local community by building new

schools, healthcare facilities, and making clean water available for drinking and farming. Romilus testified that the OPJP seeks government cooperation and the participation of local residents, although not all the townspeople support the organization.

Romilus testified that an OPJP meeting was held at the Ghantier schoolhouse on January 31, 1999. Blaise was addressing a crowd of approximately 250 to 300 people when an unspecified number of armed men, dressed in civilian clothes, entered the school and began physically assaulting the people in attendance. The assailants beat attendees with their weapons and fists and shot Blaise in the arm. Romilus himself was struck in the jaw and lost two teeth. The intruders also seized OPJP documents. Romilus was unable to identify any of the men who broke up the meeting because many of them wore masks and none wore a uniform.

Romilus fled the scene and ran toward his home. En route he was stopped by his neighbors who told him that his house had been set on fire and that armed men were waiting for him. Fearing for his life, Romilus hid in the woods. He remained in hiding, sleeping in churches and schoolhouses, until he departed Haiti in March. Nobody informed the police about the attack on the schoolhouse, and no newspaper reported the incident.

While Romilus was in hiding, his parents helped to obtain a French passport and a plane ticket for him. Romilus departed Port-au-Prince, Haiti, and entered the United States at Miami

-4-

International Airport. After his arrival in the United States, Romilus received an audio cassette tape from his wife. According to Romilus, his wife states in the tape that since he left Haiti she has experienced "problems," she has been "persecuted," and that, as a result of her persecution, she was forced to leave the house where she was living. Romilus testified that his parents also continue to live in Haiti, and that they have not been harmed since he left.

Romilus submitted background documentary evidence concerning country conditions and the often unstable political climate in Haiti.[3] Romilus's expert witness, Marlye Gelin-Adams, provided background information concerning Haiti's many local grassroots organizations. She did not, however, have any personal knowledge of the OPJP. She stated that there are some members of the government who view these grassroots organizations as a threat to their power because they exert pressure on the government to remain democratic and to honor Haiti's constitution. Additionally, she testified that there are non-governmental groups operating in

---

[3]This evidence outlines Haiti's recent turbulent political history: from the overthrow of the repressive Duvalier regime in 1986, to the installation of Haiti's first democratically elected chief executive, Jean-Bertrand Aristide, in 1990, to Aristide's ouster seven months later in a bloody coup headed by General Raoul Cedras, to the military's decline in power and Aristide's eventual return to power in late 1994. Country condition and human rights reports reflect that, despite the introduction of democracy to Haiti in the 1990s, elements of the repressive regimes lingered and human rights abuses, committed by both government and non-government actors, continued throughout the decade.

Haiti that oppose the pro-democracy grassroots organizations. According to Adams, "armed thugs" from some of these non-governmental factions have attacked and threatened members of the pro-democracy organizations, and the national police has had trouble controlling the violence because its numbers are small and its officers are inexperienced or violent themselves.

In an oral decision, the IJ denied Romilus's application for asylum and withholding of removal. The IJ found that the two incidents involving the military officer, Jean Marie, were simply the consequence of a personal dispute and were not prompted by any of the statutorily protected grounds. Similarly, the IJ found that the robbery at Romilus's home was economically motivated and not linked to any protected ground.

Regarding the fourth incident, the IJ found no evidence that the OPJP was a political player in Haiti. Based on Romilus's testimony, the IJ viewed the OPJP as a community organization created to improve living conditions for the local populace, and that it was merely Romilus's personal perception that the organization might also support his beliefs in establishing democracy in Haiti. With regard to the attack on the OPJP meeting, the IJ found it critical that Romilus could neither identify the attackers nor testify to what, if anything, the attackers said during their raid. Therefore, the IJ declined to impute any political motive to the raid.

Based on these findings, the IJ concluded that Romilus had failed to show past persecution on account of a protected ground. The IJ also found that Romilus had not established a well-founded fear of future persecution because his testimony was not credible. Having failed to establish eligibility for asylum, the IJ found that Romilus could not meet the burden for withholding of removal. Finally, the IJ found that Romilus did not present any evidence that a government official or any other person acting in an official capacity "has any interest in [him]." Therefore, Romilus had failed to meet his burden of proof under the CAT.

Romilus timely appealed to the BIA. In a per curiam decision, the BIA agreed with Romilus that the IJ's adverse credibility determination was erroneous. Nevertheless, the BIA affirmed the denial of asylum and withholding of removal, agreeing with the IJ that Romilus had "not shown a nexus between the harm he suffered and one of the five [protected] grounds." The BIA also affirmed, without discussion, the IJ's denial of relief under the Torture Convention.

## II. Standard of Review

We review the BIA's findings of fact under the "substantial evidence" standard. Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003) (citation omitted). "This standard applies both to asylum and withholding claims as well as to claims brought under CAT." Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004). The

BIA's determinations "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (citation omitted). Under this deferential standard of review, "we will not reverse unless 'the record evidence would compel a reasonable factfinder to make a contrary determination.'" Guzman, 327 F.3d at 15 (quoting Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999)); see also 8 U.S.C. § 1252(b)(4)(B). We review questions of law de novo, "including alleged errors related to due process claims." Settenda, 377 F.3d at 93 (citations omitted).

Ordinarily, this court reviews the decision of the BIA. "When the BIA does not render its own opinion, however, and either defers [to] or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ." Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003) (quoting Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002)). In this case, where the BIA's decision adopts portions of the IJ's opinion, we review those portions of the IJ's opinion that the BIA has adopted. See Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004) ("[W]hen the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA.") (citations omitted).

**III.     Discussion**

Romilus argues that the BIA committed four reversible errors:     (1) concluding that the OPJP is not a political organization; (2) concluding that the harm he suffered was not on account of his political opinion; (3) affirming the IJ's denial of asylum and withholding of removal; and (4) depriving Romilus of due process by neglecting to adjudicate his claim for relief under the CAT. Regarding the first issue, because we find the classification of the OPJP is not dispositive in this case, we will assume, for purposes of analysis and without deciding, that the OPJP is a political organization.

**A.     Asylum and Withholding of Removal**

Section 208(a) of the INA authorizes the Attorney General to exercise his discretion to grant asylum to eligible refugee aliens. 8 U.S.C. § 1159(a). The alien bears the burden of establishing eligibility for asylum by proving that he qualifies as a refugee. 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a). A "refugee" is any person who is unable or unwilling to return to his country of nationality or avail himself of that country's protection because he has suffered past persecution in that country or has a well-founded fear of future persecution in that country. 8 U.S.C. § 1101(a)(42)(A). To prove past persecution, an applicant must provide "conclusive evidence" that he has suffered persecution on one of five protected grounds:     race, religion, nationality,

membership in a particular social group, or political opinion. Albathani, 318 F.3d at 373; see also 8 C.F.R. § 208.13(b)(1). "To establish a well-founded fear of future persecution, applicants can offer specific proof, or they can claim the benefit of a regulatory presumption based on proof of past persecution." Khalil v. Ashcroft, 337 F.3d 50, 55 (1st Cir. 2003) (citations omitted).

Romilus's asylum application relies on four incidents: the two confrontations with Jean Marie, the robbery, and the raid on the OPJP meeting and subsequent burning down of Romilus's house. Substantial evidence supports the BIA's conclusion that Romilus failed to show a sufficient nexus between the harm he suffered on these occasions and one of the five grounds protected by the INA. Since the BIA's discussion of the nexus requirement implicitly adopts the IJ's findings on that issue, we will review the BIA's decision in conjunction with the IJ's findings.

With regard to the first two incidents, the record supports the IJ's conclusion that the hostilities between Romilus and Marie arose from a purely personal dispute. Marie breached an oral agreement with Romilus and, when confronted by Romilus, reacted with violence. There is no evidence that Marie threatened Romilus because of his political opinion. In fact, these incidents occurred years before Romilus joined the OPJP. The INA is not intended to protect aliens from violence based on personal animosity. See Aguilar-Solis, 168 F.3d at 572.

With regard to the 1997 incident, the IJ did not err in concluding that the robbery was economically motivated: Romilus's wife was a local street vendor who collected money daily from her sales, the money was kept in their house, the robbers wore civilian clothes, when Romilus surrendered the money the armed robbers went away, and the robbers said nothing apart from demanding the money. Romilus claims that his house was "targeted," but nothing in the record compels the conclusion that the targeting was based on Romilus's political affiliation. Indeed, a logical reading of the record leads to the conclusion that Romilus's house was targeted because it was public knowledge that his wife had money from her market business. See Albathani, 318 F.3d at 373 (the two alleged incidents of persecution "may well have been, as the IJ suggested, nothing more than the robbery of someone driving a Mercedes with cash in his pocket"). And again, this robbery occurred before Romilus joined the OPJP.

The 1999 raid of the OPJP meeting, and the subsequent burning of Romilus's house, present a closer question. The BIA found it critical that Romilus had failed to identify the attackers or to articulate any motive for the attack. In response Romilus argues, correctly, that he is not required to identify his persecutors. See Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998); Cordero-Trejo v. INS, 40 F.3d 482, 488 (1st Cir. 1994). Nor is he required to establish their exact motivations. Elias-Zacarias, 502

-11-

U.S. at 483. But he is required to "provide some evidence of [their motivations], direct or circumstantial." Id. (emphasis in original). The BIA found that Romilus failed to produce sufficient evidence in this regard, and we cannot say that a contrary finding was compelled by the record evidence.

Romilus argues that his case is akin to Cordero-Trejo. In that case, we held that an asylum applicant could not be discredited for failing to identify his persecutors when they were part of a group that was "unofficial and 'clandestine'" and were "by definition 'unknown.'" 40 F.3d at 488. But that opinion went on to explain that "the only way [such clandestine persecutors] are knowable, i.e., distinguishable from mere bandits and criminals, is by the threats and indications of motive that typically precede or accompany their violence." Id. In contrast to Cordero-Trejo, here there is no evidence that the attackers demanded Romilus to "discontinue his activities with" the OPJP, nor that he received "warnings of future violence should he disregard" those demands. Id. In our view, the present case is more comparable to Aguilar-Solis, where we held that the petitioner's evidence of persecution "lacked the requisite degree of specificity" necessary to establish "a sufficient nexus between the events that [the petitioner] described and any" statutorily protected ground. 168 F.3d at 571. Accepting Romilus's testimony as true, and assuming that the OPJP is a political organization, the record does not establish that the

-12-

attackers of the OPJP meeting were motivated by a desire to suppress the OPJP's political aspirations. There is no evidence that the attackers were even aware of the OPJP. See id. Perhaps the best evidence in support of Romilus's argument is the seizure of the OPJP documents. The BIA might have inferred that the attackers seized those documents because they sought to disrupt the OPJP. This evidence, however, is far from conclusive. "Where, as here[,] the constellation of facts and circumstances alleged by an asylum applicant, together with the other record evidence, supports two or more competing inferences, the IJ's choice among those inferences cannot be deemed erroneous." Id. (citation omitted).

Since Romilus failed to establish past persecution, he is not entitled to the statutory presumption of a well-founded fear of future persecution. Nelson v. INS, 232 F.3d 258, 264 (1st Cir. 2000). Nevertheless, Romilus could establish a well-founded fear of persecution if he could prove that "a reasonable person in [his] circumstances would fear persecution on account of a statutorily protected ground." Khalil, 337 F.3d at 56 (quoting Aguilar-Solis, 168 F.3d at 572). Accordingly, a well-founded fear analysis contains both a subjective and objective component: Romilus's asserted fear must be both subjectively genuine and objectively reasonable. Guzman, 327 F.3d at 16 (citations omitted).

By reversing the negative credibility determination and affirming the IJ solely on the ground that there was no nexus to a

protected ground, the BIA implicitly accepted that Romilus had a subjectively genuine fear. Thus, we focus on whether a reasonable person in Romilus's circumstances would fear persecution on account of a protected ground. The record does not compel this conclusion.

Romilus claims that his wife faces continuing persecution in Haiti. His testimony on this topic, however, was ambiguous, not "specific" as required. Id. Romilus testified on direct examination that his wife had sent him an audio cassette in which she stated that she has had "a lot of problem[s]" since he left the country, and that she has been "persecuted." But, when asked follow-up questions, Romilus provided no details other than to repeat that she has had some kind of undefined problems. Even assuming Romilus's spouse has faced persecution, his conclusory testimony is insufficient to provide any link between the persecution and a protected ground. See Aguilar-Solis, 168 F.3d at 573 (rejecting the probative value of letters written by persons living in the country of removal because the correspondence contained no "specifics as to the nature of any danger, the identity of any potential malefactors, or the reasons why people might wish to harm the petitioner"). Moreover, Romilus testified that his parents still live in Ghantier and they have suffered no harm since he left the country. See id. ("[T]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return.").

The BIA reasonably concluded that Romilus could be returned to Haiti without facing future persecution. Romilus has failed to establish his eligibility to be considered for the discretionary relief of asylum.

Withholding of removal, which provides mandatory relief, imposes a higher standard than asylum. INS v. Aguirre-Aguirre, 526 U.S. 415, 419 (1999) (an applicant for withholding of removal must prove that it is "more likely than not" that he would be subject to persecution on account of a protected ground). Because Romilus failed to satisfy the more lenient asylum standard, he a fortiori cannot satisfy the withholding of removal standard. Albathani, 318 F.3d at 374.

### B.    Convention Against Torture

The standard for relief under the CAT is different than for asylum or withholding of removal. The applicant need not prove the reason for the torture, nor that he has a well-founded fear of being tortured. Rather, he must establish that it is "more likely than not" that he will be tortured if he is returned to the proposed country of removal. Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004) (citing 8 C.F.R. §§ 208.16(c)(2), 208.17(a)). Unlike an asylum claim, then, there is no subjective component. To establish a prima facie claim under the CAT, an applicant must offer specific objective evidence showing that he will be subject to: "(1) an act causing severe physical or mental pain or

-15-

suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." Id. (quoting In re J-E-, 23 I. & N. Dec. 291, 297 (BIA 2002)); see also 8 C.F.R. § 208.18(a). Thus, an applicant must demonstrate that any torture he will suffer would be at the hands of the government or with the consent or acquiescence of the government. Guzman, 327 F.3d at 17.

Romilus contends that the absence of written analysis in the BIA's disposition of his CAT claim deprived him of due process. The BIA is not required, however, to provide a written analysis of every issue contested before the IJ. See Morales v. INS, 208 F.3d 323, 328 (1st Cir. 2000); Chen v. INS, 87 F.3d 5, 8 (1st Cir. 1996). The BIA may adopt all of or portions of the IJ's opinion. See Albathani, 318 F.3d at 377-78. We read the BIA's opinion as adopting the IJ's analysis of the CAT claim.[4] Thus, we will review the IJ's opinion with regard to the CAT claim.

---

[4]The BIA rejected the IJ's adverse credibility determination, yet affirmed the IJ's ultimate conclusions. Since the negative credibility finding was important to the IJ's well-founded fear analysis, the BIA was required to clarify that it was affirming the IJ on the basis of the IJ's finding that there was no nexus between any such fear and a protected ground. The IJ's analysis of the CAT claim, however, did not rely on the negative credibility determination. Therefore, since the BIA agreed with the IJ's CAT analysis, the BIA was not obligated to provide its own analysis of that claim.

The IJ denied Romilus's CAT claim based on a lack of evidence showing that he is likely to be tortured by or with the consent or acquiescence of a public official or other person acting in an official capacity. Indeed, with the possible exception of the two incidents with the military officer, Jean Marie, there is no evidence that any of the above-mentioned incidents were instigated on behalf of, with the consent of, or with the acquiescence of the government. See Guzman, 327 F.3d at 17. With regard to the two incidents with Marie, the IJ reasonably found that these incidents sprang from a personal dispute. Thus, Marie was not acting in an official capacity when he assaulted Romilus. Moreover, as the IJ noted, Romilus did not experience any further problems with Marie after the two incidents in 1994.

Romilus argues that expert testimony and documentary evidence establish that the Haitian government sanctions attacks on democratic organizations such as the OPJP. But this evidence falls short of meeting the burden required under the CAT. None of this evidence specifically refers to Romilus or the OPJP. Moreover, even Romilus's expert witness had difficulty identifying which groups might be interested in persecuting Romilus upon his return to Haiti and whether or not those groups were connected to the government. She did testify that there are some members of the government who are involved in oppressing groups similar to the OPJP, but we would be hard pressed to find that her uncertain

-17-

testimony on this point satisfies the "more likely than not" standard. In any event, it does not "compel" reversal of the IJ.

Romilus has not established that it is more likely than not that he will be subjected to torture if he is returned to Haiti.

**IV.      Conclusion**

For the foregoing reasons, the petition for review is **denied**.

**So ordered**.