**Not for Publication in West's Federal Reporter**

# United States Court of Appeals

## For the First Circuit

No. 07-1751

KETTLY PROSPER,

Petitioner,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lipez and Howard, <u>Circuit Judges</u>,

and Besosa<sup>*</sup>, <u>District Judge</u>.

        Susana L. Schafer, on brief for petitioner.
        Ronald B. Seely, Attorney, Office of Immigration Litigation,
Ahn-Thu P. Mai, Senior Litigation Counsel, Office of Immigration
Litigation, Jeffrey S. Bucholz, Acting Assistant Attorney General,
Department of Justice, on brief for respondent.

October 20, 2008

---

<sup>*</sup>Of the District of Puerto Rico, sitting by designation.

**BESOSA, <u>District Judge</u>.**   The Board of Immigration Appeals ("BIA") adopted and affirmed an Immigration Judge's ("IJ") denial of Kettly Prosper's claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Ms. Prosper, a native and citizen of Haiti, petitions this court for a review of the BIA's denial of her claims.  We deny the petition for review.

## I.   Background

The IJ made an adverse credibility finding because of material inconsistencies between Ms. Prosper's testimony before the IJ and her prior testimony.  This adverse credibility determination is the basis for our denial of Ms. Prosper's claims for asylum, withholding of removal and protection under CAT.

Ms. Prosper arrived in or around Miami, Florida from Haiti on or about January 16, 2001.  She did not pass through any kind of immigration control.  On September 6, 2001, Ms. Prosper filed a Form I-589 Application for Asylum and Withholding of Removal.  In the form she claimed that if she returned to Haiti she would be persecuted on account of her political opinions and her membership in a particular social group known by its acronym as "MDN."  An Asylum Officer ("AO") interviewed Ms. Prosper on April 4, 2002, which lead to the referral of her application to the immigration court because the AO determined that her testimony was not credible.  On April 18, 2002, the Immigration and Naturalization

- 2 -

Service ("INS") served Ms. Prosper with a Notice to Appear ("NTA") in person, charging her with removability, and placed her in removal proceedings.

Ms. Prosper appeared at four hearings. On September 6, 2002, she appeared *pro se* at the Miami Immigration Court, requested a continuance, and informed that court that she would file a change of venue motion. On March 5, 2003, Ms. Prosper appeared at the Boston Immigration Court where she admitted the factual allegations of the NTA and conceded removability. On March 10, 2005, she appeared once again before the Boston Immigration Court, at which time the court found that Ms. Prosper's application was timely filed. Finally, on June 2, 2005, Ms. Prosper appeared before the Boston Immigration Court again and testified concerning the factual background to her claims. The following is a summary of her June 2, 2005 testimony, except where a statement is specifically attributed to a different source.

Ms. Prosper testified that she suffered persecution in Haiti because she was a member of a political party called "MDN." She testified that MDN stands for "National Democratic Movement." After being informed that MDN actually stands for Mobilization for National Development, Ms. Prosper responded that some people call the organization National Democratic Movement. There is no other support for this dual name, however, in the record. She initially said that she joined MDN in October 1990. When asked if party

leader Hubert de Ronceray left Haiti between 1990 and 2001, Ms. Prosper answered no.  When Ms. Prosper was told affirmatively that Ronceray was expelled from Haiti in 1990 and that he went into exile in 1997, she admitted that she was unaware of Ronceray's departures, but she explained this by saying that she did not join the MDN until October 1999, not 1990.  She said she misunderstood the earlier question concerning her joinder of MDN.  Her MDN membership card was dated 1995 and had an illegible seal.  To explain why her card was dated 1995, when she later claimed to have joined MDN in 1999, Ms. Prosper stated that the card was pre-made.

Ms. Prosper was also unaware of other significant political events impacting the MDN.  On May 21, 2000, there was a disputed election in Haiti, after which opposition parties, including the MDN, joined together to form the Democratic Convergence. Nonetheless, Ms. Prosper did not identify the Democratic Convergence, was unable to state whether MDN joined any coalitions, and could not recall if there were elections in Haiti in the year 2000 prior to the election held in November 2000.

Ms. Prosper said that she invited people to meetings on behalf of MDN and then listened to speakers at those meetings.  She said that once she arrived in the United States, she stopped all involvement in MDN or any other political organization.  She did not know the date MDN was founded.  She was also unaware of the name of the current president of Haiti.

- 4 -

Ms. Prosper also testified that she was attacked on two separate occasions because of her membership in MDN. The first alleged attack occurred on November 27, 2000. She testified that, as she was walking along a street, she was surrounded by five men who accused her of working for MDN. The men told her that she had to work for Lavalas or die. The men pushed her into a car; when the car broke down a few miles later, the men argued over what to do with her. One man wanted to kill her whereas another man said to let her go because they would be able to find her again and kill her later. The men then threw her out of the car, kicked her several times and left. She laid on the ground until people passing by gave her water and helped her get into a taxi. The attackers worked for Aristide, according to Ms. Prosper, because they referred to Lavalas and used violence against her.

Ms. Prosper's recollection of events seemed to vary with each telling. In her interview with the AO she did not mention that the men who grabbed her were Aristide supporters, and did not say that they told her to "work for Lavalas or die." In that interview she said they told her she would "find out" and that they said "kill the bitch." In the Form I-589 submitted on September 6, 2001, however, Ms. Prosper claimed that she was "arrested" by "Lavalas government" workers who told her "[y]ou are in opposition against Lavalas. You lost. Aristide or death." In that same form she claimed that the car only drove three blocks before running out of

- 5 -

gas.  This also differs slightly from her June 2005 affidavit, in which she stated that the car went five blocks, before she was thrown from the car and landed on her head, but in which she made no mention of being kicked.  In that affidavit Ms. Prosper said that she thought she was attacked because she did not vote in the November 2000 presidential elections and she made no mention of her membership in MDN.

The second alleged attack occurred on December 3, 2000.  At 11:30 p.m., five men entered her house by breaking down the door. They shouted her name, asked where she was and accused her of working for MDN.  They blindfolded a few people that were in her house and then she was beaten, raped and left unconscious. Ms. Prosper's mother treated her with herbal medicine but she began to vomit blood so her mother took her to a hospital in Aux Cayes, where she stayed for three days.  She did not tell the doctor at that hospital that she had been raped because she felt embarrassed and traumatized.  Upon leaving the hospital, she went to a friend's house because she was afraid to go home.  From there she went to Gonaives and boarded a boat for the United States.  She left Haiti

on January 12, 2001 and arrived in the United States on January 16, 2001.[2]

As with Ms. Prosper's testimony concerning the earlier attack, there are inconsistencies between her accounts of the December 3, 2000 attack. In her June 2005 affidavit, Ms. Prosper states that everyone in her house was blindfolded. In her statement to the AO, however, Ms. Prosper said that her brother and father were tied up and blindfolded, and that she was kicked and beaten unconscious, but she did not mention that she was raped. She also failed to mention that she was raped in her Form I-589 submitted on September 6, 2001. She also failed to tell the AO that she was hospitalized. Nor did she mention in her September 2001 Form I-589 that she was hospitalized. Although psychiatric evaluation did report Ms. Prosper as saying she was hospitalized, the evaluation notes that she said that her cousin, not her mother, took her to the hospital in Aux Cayes. Ms. Prosper submitted no documentation related to her hospital visit.

Ms. Prosper further testified that she became HIV positive as a result of the rape on December 3, 2000. She said that she first

---

[2] Ms. Prosper testified that she paid $2,000 to someone who arranged her transport to the United States. She said that she left Haiti on a large boat, then transferred to a small boat that took her ashore in Miami. She then met a Haitian person who drove her to her aunt's house. She did not mention any of this information in her September 2001 Form I-589. In her June 2005 affidavit, she stated that she arrived in the United States at the "Port of Miami" and requested asylum. The IJ noted that Ms. Prosper struggled to provide any more detail upon request.

- 7 -

discovered she was HIV positive between 2001 and 2002, but she has no record of the diagnosis at that time. A letter submitted by her treating physician to the court states that Ms. Prosper was diagnosed as HIV positive in July 2004.

Despite Aristide's ouster in 2004, Ms. Prosper claims that she fears returning to Haiti because Aristide supporters still abound and she believes those supporters will find her and kill her. She heard from a friend that MDN still exists and she said that she would continue to be active in MDN if she returned to Haiti.

## II.  Standard of Review

Ordinarily this court reviews the decision of the BIA, but where the BIA adopts the opinion of an IJ, we then must also review the decision of the IJ. Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004). In this case, the BIA adopted and affirmed the decision of the IJ, although it also briefly explained why it did not find the Petitioner's appeal persuasive.

We review the BIA's findings of fact under the "substantial evidence" standard which applies to claims of asylum, withholding and protection under CAT. Id. The BIA's findings, including credibility determinations, must be upheld as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007) (quoting INS v. Elias-Zacarias, 502 U.S. 478 481, 112 S.Ct. 812 (1992) (citation omitted)). This deferential

- 8 -

standard permits reversal of a BIA decision on sufficiency grounds only where the record evidence would compel a reasonable factfinder to make a contrary determination. Aquilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999) (citing Elias-Zacarias, 502 U.S. at 481 & n.1.).

### III. Discussion

On appeal Ms. Prosper argues that the BIA should have overturned the IJ's credibility determination as clearly erroneous and not based upon substantial evidence. In ruling against her, Ms. Prosper argues, the IJ relied upon illusory or minor inconsistencies that do not touch upon the heart of the asylum claim. While true that the credibility determination may not rest on trivial discrepancies, Pan v. Gonzales, 489 F.3d at 86 (citations omitted), many of the discrepancies in this case are material to Ms. Prosper's claim, and the numerous seemingly minor discrepancies also undermine Ms. Prosper's credibility. Id. ("Some of these inconsistencies, in isolation, may seem like small potatoes. What counts, however, is that their cumulative effect is great.") (citation omitted).

To establish eligibility for asylum, an alien such as Ms. Prosper must demonstrate that she is a refugee. 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a). Refugee is defined by the act as a person unable or unwilling to return to her country or nationality (or country of last habitual residence) "because of

persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Ms. Prosper bears the burden of proof for establishing her eligibility for asylum. 8 U.S.C. § 1158(b)(1)(B)(i). To show past persecution, she must provide "conclusive evidence" that she has suffered persecution on one of the five protected grounds. Romilus, 385 F.3d 1 at 6 (citation omitted). To show a well-founded fear of future persecution, Ms. Prosper must show both that her fear is genuine and that it is objectively reasonable, Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999) (citing Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990)), or she may benefit from a regulatory presumption based upon proof of past persecution. Khalil v. Ashcroft, 337 F.3d 50, 55 (1st Cir. 2003). To meet the objective prong of the well founded fear test, Ms. Prosper need only show a "reasonable possibility" that, if denied asylum (and thereafter removed to her homeland), she will be persecuted on account of a protected ground. Aguilar-Solis v. INS, 168 F.3d 565, 572 (1st Cir. 1999) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987)). This showing requires "credible, direct, and specific evidence." Khalil, 337 F.3d at 55 (citation omitted).

To qualify for withholding of removal, which provides mandatory relief, Ms. Prosper must meet a higher standard than that

required for asylum: she must show that, more likely than not, she faces persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, should she return to her homeland. INS v. Aguirre-Aguirre, 526 U.S. 415, 419 (1999).

Relief under the CAT, unlike asylum or withholding of removal, does not require Ms. Prosper to prove the reason for torture. Romilus, 385 F.3d at 8. Instead, an applicant must prove that it is more likely than not that she will be tortured if she is returned to the proposed country of removal. Id. To establish a prima facie claim, Ms. Prosper must offer specific objective evidence showing that she will be subject to "(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." Id. (citing Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004) (citations omitted)).

On appeal Ms. Prosper argues that many of the inconsistencies perceived by the IJ were actually differences in detail, differences in word choice, or indicative of a misunderstanding by

the IJ.[3]  She adds that the IJ and the BIA failed to evaluate the materiality of the inconsistencies in Ms. Prosper's testimony. This second assertion is simply not true; the IJ specifically stated that the discrepancies and inconsistencies in Ms. Prosper's testimony were material to her claims for relief.  We agree.  We also note, as we have before, that a witness's demeanor may be a critical factor in determining her truthfulness.  <u>Laurent</u> v. <u>Ashcroft</u>, 359 F.3d 59, (1st Cir. 2004).  "Where, as here, the judicial officer who saw and heard the witness makes an adverse credibility determination and supports that determination with specific findings, an appellate court should treat that determination with great respect."  <u>Id</u>.  (citations omitted).

The IJ grouped the discrepancies in Ms. Prosper's testimony into six different categories:  (1) her involvement in MDN; (2) the

---

[3] For example, Ms. Prosper notes on appeal that the IJ found her testimony concerning the November 27, 2000 attack to be inconsistent because she asserted at one point that she was attacked because she did not vote in the November 2000 elections, whereas she asserts at another point that she was attacked because of her membership in MDN.  Ms. Prosper argues that this difference in testimony reflects a difference in detail rather than a difference in substantive testimony because she explained at another point in her testimony that only Lavalas party members voted in the November 2000 election.  Therefore when she said that she was attacked for not voting in the election, it was implicit that she was attacked for not being a Lavalas supporter, although this does not mean that she was necessarily a MDN member (as MDN did not represent all non-Lavalas supporters).  Although Ms. Prosper's explanation of this inconsistency cited by the IJ may be persuasive, there are still numerous other inconsistencies that abound in the record which Ms. Prosper has not addressed to our satisfaction.

November 27, 2000 attack; (3) the December 3, 2000 attack; (4) her hospitalization subsequent to the December 3, 2000 attack; (5) her arrival in the United States; and (6) her diagnosis as being HIV positive. The most important of these six categories is the first one, which is the basis for Ms. Prosper's claims for asylum and withholding of removal.

Ms. Prosper claims that she was persecuted in the past because of her involvement with MDN, thus thrusting her involvement with MDN to the forefront of this case. She erroneously believed that the acronym MDN stands for National Democratic Movement, when it actually stands for Mobilization for National Development. She was unaware that the leader of the MDN left Haiti twice in the 1990s. She claimed that she joined MDN in 1990, later claimed that she did so in 1999, and submitted a MDN membership card that appears to have been issued in 1995. Finally, and perhaps most importantly, Ms. Prosper failed to recall two watershed events in MDN history: the disputed May 2000 election and MDN's subsequent joinder of other opposition parties to create a coalition called the Democratic Convergence. Altogether, Ms. Prosper's inconsistent statements, and apparent lack of awareness concerning MDN-related matters, provide ample ground to support the IJ's adverse credibility finding.

Although we have previously noted other discrepancies in Ms. Prosper's testimony, they are not as striking or significant as

those concerning MDN and do not merit additional examination here. Nevertheless, they further support the IJ's adverse credibility determination.

The discrepancies in Ms. Prosper's testimony, especially those regarding events giving rise to her claims for asylum, withholding of removal and protection under CAT, provide substantial evidence to support the IJ's adverse credibility determination. This adverse credibility determination is fatal to all three claims (asylum, withholding of removal, and CAT) because they all rely on the same discredited testimony.[4] <u>See</u>, <u>e.g.</u>, <u>Desna</u> v. <u>Gonzales</u>, 454 F.3d 896, 898-99 (8th Cir. 2006). Accordingly, we conclude that the IJ did not err in determining that Ms. Prosper was not credible.

## IV. Conclusion

For the reasons stated above, we deny the petition for review and affirm the decision of the BIA.

---

[4] We note that in so deciding, we have not stated that an adverse credibility finding that defeats a request for asylum *a fortiori* defeats a CAT claim. <u>See</u> <u>Settenda</u> v. <u>Ashcroft</u>, 377 F.3d 89, 94-95 (1st Cir. 2004). Rather, Ms. Prosper does not point to any other evidence in the record outside of her discredited testimony that supports her CAT claim.