**Dani Lahoud JOUMAA, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 03–2382.

United States Court of Appeals, First Circuit.

Sept. 7, 2004.

Derege B. Demissie on brief for petitioner.

Erica A. Franklin, Attorney, Civil Division, Department of Justice, Peter D. Keisler, Assistant Attorney General, Civil Division, and M. Jocelyn Lopez Wright, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

Before TORRUELLA, LYNCH, HOWARD, Circuit Judges.

**16**

LYNCH, Circuit Judge.

Dani Lahoud Joumaa, a native and citizen of Lebanon, entered the United States on December 4, 2000, as a transit visitor from El Salvador to Madrid without a visa to enter the United States. He presented himself to U.S. officials at the Miami airport and requested political asylum.

On December 22, 2000, the former Immigration and Naturalization Service (INS) initiated removal proceedings against Joumaa by issuing a Notice to Appear, charging him with being removable from the United States. Represented by counsel and testifying through a translator at his removal hearings, the petitioner conceded removability, applied for political asylum and withholding of removal, and requested protection under the Convention Against Torture (CAT).

On February 5, 2002, the Immigration Judge (IJ) denied his claims after finding that the petitioner was not credible and had failed, in any event, to establish eligibility for asylum, withholding of removal, and protection under the CAT. The Board of Immigration Appeals (BIA) affirmed, without opinion, the IJ's order and dismissed petitioner's administrative appeal. On October 9, 2003, Joumaa petitioned this Court for review of the BIA's order. We now affirm.

## I.

We summarize the evidence presented by Joumaa based on the record of the removal proceedings.

Joumaa testified that he is a Maronite Christian and conceded that this is the same religion as that of the then-president of Lebanon. He joined the Lebanese Forces, which he characterized as a non-governmental Christian political party, in 1989, and worked as a driver with Raji Abdo, who was the second in command in

the Jabal area, for two years between 1989 and 1991. He testified he was still a member of the Lebanese Forces when he left Lebanon. When questioned about how he remained a member if the Lebanese Forces were disbanded in 1991 (as he said), his reply was that it was disbanded as a military force but still met privately. In his testimony, he also referred to the Lebanese Forces as the Lebanese army, and then said that was a mistake.

As the basis for his claims, Joumaa recounted two occasions when he suffered problems that he said resulted from his membership in the Lebanese Forces. The first incident occurred in September 2000 in El Chibar Mayfouq. Joumaa and about 15,000 others were present at a public rally "to attend the prayers for the Lebanese martyrs." Joumaa testified that "an armed force from the Lebanese government supported by Syrian military people" began arresting people in order to stop the prayers, which called for the Syrians to leave Lebanon. Joumaa thought the armed forces included Syrians because they, the Syrians, wore civilian clothing instead of the Lebanese military uniform. Joumaa first said that about 200 people were arrested on this occasion, and then said that number was too much; he had only been estimating. In his affidavit, he stated flatly that over 200 Christians had been "kidnapped [sic]" that day. He ran, along with the others, to avoid being arrested. He successfully escaped to a friend's house. When asked if this incident was written up in any newspapers, he said "it was not supposed to be in the paper." As to his period in hiding, he first said people had harmed him and then said nothing had happened to him but he was afraid. He also said that he talked about the Mayfouq incident with an officer of the Lebanese Forces in 2000.

The second incident occurred later, on September 26, 2000. Joumaa testified that while driving on a highway, a black car without plates "tried to catch" him. He thought the people in the car were Syrians because "nobody would be in such cars except the Syrians." He heard the sound of guns behind him shooting in his direction. He saw a pistol.

After this car chase, Joumaa hid at a friend's house. He called his parents and learned from his mother that after the prayer event in Mayfouq, the Syrians had come to his parents' house twenty times within two weeks to look for him. Joumaa testified that the Syrians threw his mother to the ground and told her that they wanted Joumaa "alive or dead."

Joumaa testified that he stayed in hiding in Lebanon until he flew from Lebanon to Egypt, and from there he eventually arrived in El Salvador, after several stops along the way. At a stopover in Miami during his trip from El Salvador to Madrid, he requested political asylum from U.S. officials at the airport.

Joumaa testified that he was afraid when he was in hiding but nothing happened to him. His family continues to live in Lebanon, and his parents and siblings, also Maronite Christians, have not been harmed.

## II.

When the BIA affirms the IJ's order without opinion, the appellate court reviews the findings and conclusions of the IJ as the final agency determination. *Albathani v. INS*, 318 F.3d 365, 373 (1st Cir.2003).

The IJ found Joumaa's version of these events to be "incredible, ... non-plausible." In particular, the IJ found the car chase incident "not plausible within the course of everyday reason" because "to the extent that a car with Syrian troops wished to kill [Joumaa] and pulled up next to him and fired shots at him, there is practically no way in the realm of reason that [he] could have escaped the attack." The IJ also disbelieved the testimony regarding Joumaa's attendance at the prayer meeting in Mayfouq, pointing out that Joumaa gave no corroborative evidence. As for the testimony that Syrian forces came to Joumaa's parents' house twenty times in two weeks and told his mother that they wanted "[her] son alive or dead," the IJ concluded that the alleged behavior of the Syrian forces "does not make any sense" if their intent was truly to either capture Joumaa or kill him. "What better way of *not* finding [Joumaa] than to indicate to his mother that they wanted him dead or alive[?]"

Furthermore, the IJ concluded that even if Joumaa's testimony were considered credible, it was not persuasive and failed to establish that he had a well-founded fear of persecution or that his life would be threatened. The IJ described Joumaa's statements as "general and meager ... unsubstantiated and conjectural at best and non-persuasive at the very least." In particular, the IJ noted that even assuming that the Mayfouq incident occurred the way Joumaa described it, it did not have much weight since he would be "just one of 15,000 people who ran away...."

The IJ found no evidence that Joumaa would face torture if he went back to Lebanon.

Accordingly, the IJ denied Joumaa's application for asylum, withholding of removal, and protection under the CAT.

## III.

We review the IJ's decision under the deferential substantial evidence standard. *INS v. Elias–Zacarias*, 502 U.S. 478, 481,

112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The decision "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation omitted). The factual findings of the IJ are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

We address in sequence Joumaa's challenges to (i) the IJ's adverse credibility determinations against him, and (ii) the IJ's conclusion that even if the evidence were credible, he failed to establish eligibility for asylum, withholding of removal, and protection under the CAT.

## A.

We review the IJ's credibility determinations with deference, subject to the condition that they are supported by specific findings in the record. *See El Moraghy v. Ashcroft,* 331 F.3d 195, 205 (1st Cir.2003). "[W]hen a hearing officer who saw and heard a witness makes an adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect." *Aguilar–Solis v. INS,* 168 F.3d 565, 571 (1st Cir.1999)

■ Joumaa challenges the IJ's credibility determinations on two grounds: (i) the IJ made findings against the weight of the evidence by misunderstanding his testimony and (ii) the IJ committed reversible error by requiring corroborating evidence to establish Joumaa's credibility.

Upon the first ground, Joumaa contends that the IJ failed to meet the substantial evidence standard because his findings were premised upon faulty understanding of the testimony at the time of the hearing.

Examination of the record, however, shows that Joumaa had the opportunity to clarify any misunderstanding but failed to do so, and we cannot say from the evidence that the IJ's understanding is unsupported. In his brief, Joumaa makes much of the fact that the IJ, during the hearing, misunderstood his testimony regarding the black car incident to mean that "a black car full of Syrians pulled up next to [him] and [shot] at [him]" when he only meant that the black car was following him and he heard the sound of gunshots. Joumaa's actual testimony was, "All of the sudden I was *caught* by another car.... And then I heard the sound of guns behind me" (emphasis added). At that point in the record, the IJ paused the hearing and cautioned Joumaa to testify "accurately." The IJ explained his understanding of what Joumaa was saying, and asked for clarification and "the truth as to what happened." If there was a misunderstanding, Joumaa had ample opportunity right then to correct the IJ, but the record shows no attempts to do so. Twice the IJ asked Joumaa whether the men in the black car were shooting at Joumaa and twice the IJ asked Joumaa whether he saw the firearms. The IJ never received an unambiguous answer. Indeed, interview notes show that Joumaa told an INS officer that the black car "intercepted me." Given Joumaa's ambiguous phrasing, failure to clarify, and claim that the Syrian forces wanted him "alive or dead," the IJ's interpretation of Joumaa's testimony (and subsequent disbelief) was justified. Other examples offered by Joumaa were either harmless typographical errors or due to internal contradictions within the evidence offered by Joumaa.[1] On the whole, we

---

1. Joumaa criticizes the IJ for writing "a group of people from the Syrian army came to his house and confronted him" in his decision when the army actually confronted Joumaa's mother. The fact that the IJ twice correctly noted that the confrontation oc-

cannot say that the record compels the conclusion that the IJ's interpretation of Joumaa's testimony was faulty.

A review of the record shows that the adverse credibility determination was grounded in specific findings and substantial evidence. The IJ specifically explained that he did not believe the black car incident because it was unlikely Joumaa could have survived such an attack as the IJ understood it. The IJ did not believe that Syrian forces came to Joumaa's parents' house twenty times within two weeks and told Joumaa's mother that they wanted her son "alive or dead" because such actions would decrease the chances that they catch Joumaa or kill him. The alleged actions "def[ied] logic."

Upon the second ground, Joumaa contends that the IJ erred by requiring corroborating evidence for his testimony. While it is true that "[t]he testimony of the applicant, *if credible*, may be sufficient to sustain the burden of proof without corroboration," 8 C.F.R. § 1208.13(a) (emphasis added), the testimony must first be credible. A conspicuous lack of corroborating evidence that should be obtainable by the petitioner without great difficulty is a cogent reason for doubting the credibility of the testimony. *See Albathani*, 318 F.3d at 373. Here, Joumaa testified that he was in contact with his family on a weekly basis and presented a letter from Raji Abdo in the Lebanese Forces written on his behalf. Yet, there was no evidence from his family to corroborate either the car chase incident or the Mayfouq prayer incident. And Raji Abdo was, by Joumaa's testimony, present at the Mayfouq incident, but his statement says nothing about the incident. He provided no newspaper account of the Mayfouq incident, and he never reported either of the incidents to

any government official. As the IJ puts it, "Certainly anything is possible. However, there are some things that ... defy logic and require some sort of verification by objective documentation." Given such a conspicuous lack of corroborating evidence that appears to have been available to Joumaa, the IJ had good reason to doubt the credibility of the petitioner.

**B.**

■ Even assuming that Joumaa's testimony was credible, sufficient evidence supported the IJ's decision that he did not meet the eligibility requirements for asylum, withholding of removal, or protection under the CAT.

The petitioner has the burden of proof for establishing eligibility for asylum. 8 C.F.R. § 1208.13(a). In order to obtain asylum, applicants must show either past persecution or a well-founded fear of future persecution based on one of the five statutory grounds: "race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1208.13(b)(1).

To prove past persecution, the petitioner must provide persuasive evidence that he was persecuted on any of the five statutory grounds. *Velasquez v. Ashcroft*, 316 F.3d 31, 34–35 (1st Cir.2002). To demonstrate a well-founded fear of future persecution, "a petitioner must satisfy both an objective and a subjective test." *Khalil v. Ashcroft*, 337 F.3d 50, 55 (1st Cir.2003). The individual's fear "must be both genuine and objectively reasonable." *Aguilar–Solis*, 168 F.3d at 572. The petitioner may either "offer specific proof, or [he] can claim the benefit of a regulatory presumption based on proof of past persecution." *Khalil*, 337 F.3d at 55.

curred with Joumaa's mother elsewhere in the opinion indicates that this was a simple

typographical error rather than a true misunderstanding.

The test for withholding of removal is even more stringent than the test for asylum. *Albathani,* 318 F.3d at 372. If the petitioner cannot meet the standard for asylum, he *a fortiori* cannot meet the standard for withholding of removal. *Alvarez–Flores v. INS,* 909 F.2d 1, 4 (1st Cir.1990).

With regard to Joumaa's claim for protection under the CAT, such protection is granted where there are "substantial grounds for believing [applicants] would be subject to torture" if returned to their home countries. *Albathani,* 318 F.3d at 372 n. 3. When the applicant provides no evidence that "it is more likely than not that he ... would be tortured if removed to the proposed country," he cannot be granted protection under the CAT. 8 C.F.R. § 1208.16(c)(2).

Substantial evidence in the record supports the IJ's finding that, even if credible, Joumaa's version of events failed to provide persuasive evidence of past persecution or establish a well-founded fear of future persecution. As the IJ noted, Joumaa's testimony involved numerous "unsubstantiated and conjectural" statements that fail to demonstrate an objectively reasonable fear of future persecution. In addition, Joumaa conceded that his religion is the same as that of the then-president of Lebanon and that his family continues to live in Lebanon and has not suffered any harm. The petitioner has thus failed to provide persuasive evidence that he was or will be persecuted as a result of his membership in the Lebanese Forces, his religion, or his political opinion.

In addition, because Joumaa failed to meet the more lenient standard for asylum, he also failed to meet the standard for withholding of removal. Since he has given no evidence that he has suffered torture at the hands of the government or would be likely to suffer such torture if returned to Lebanon, he cannot be granted protec-

tion under the CAT. Accordingly, we deny the petition for review and affirm the decision of the BIA.

## IV.

The decision of the BIA is *affirmed.*