**Not For Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals

## For the First Circuit

No. 05-2802

DRITAN VAKA; RANOLA VAKA; and BRIANA VAKA,

Petitioners,

v.

ALBERTO R. GONZÁLES,
UNITED STATES ATTORNEY GENERAL,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before

Boudin, <u>Chief Judge</u>,
Torruella and Lipez, <u>Circuit Judges</u>.

---

<u>Aleksander Milch</u>, and <u>Christophe & Associates, P.C.</u>, on brief for petitioners.
<u>Laurie Snyder</u>, Attorney, Tax Division, U.S. Department of Justice, <u>Peter D. Keisler</u>, Assistant Attorney General, Civil Division, and <u>Terri J. Scadron</u>, Assistant Director, Civil Division, Office of Immigration Litigation, on brief for respondent.

---

August 31, 2006

---

**TORRUELLA**, **Circuit Judge**.    Petitioners Dritan Vaka, Ranola Vaka, and Briana Vaka (collectively, the "Vakas") seek review of a decision by the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").    For the reasons set forth below, we affirm the BIA's decision and deny the petition for review.

## I.  Background

Dritan and Ranola Vaka are married and the parents of Briana Vaka.    All three are citizens of Albania who entered the United States on or about December 19, 2000,[1] without being lawfully inspected, admitted or paroled.    On November 19, 2001, Dritan filed an application for asylum, alleging persecution on account of his political opinion.[2]    On June 12, 2002, the Immigration and Naturalization Service ("INS")[3] served Dritan with a Notice to Appear, charging the Vakas with removability under

---

[1]  The exact date of the Vakas' arrival in the United States is not certain.  However, the Government does not dispute the assertion that the entry occurred around this time.

[2]   Dritan Vaka is the lead petitioner in this case and the only individual claiming to have suffered persecution.  His wife and daughter's applications for asylum are derivative of his own, depending wholly on the merits of Dritan's claim.

[3]   In March 2003, the relevant functions of the INS were transferred to the new Department of Homeland Security and reorganized as the Bureau of Immigration and Customs Enforcement ("BICE").  For clarity, the agency will continue to be referred to as the INS throughout this opinion.

§ 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i).

At a hearing before an Immigration Judge ("IJ") on November 4, 2002, the Vakas admitted the allegations against them and conceded removability. On March 5, 2004, the Vakas again appeared before the IJ, and Dritan presented testimony detailing the family's experiences in Albania prior to their departure for the United States.[4]

Dritan was born April 24, 1970 in the town of Kelcyre-Permet ("Permet"). Professionally, he was employed as a taxicab driver and owned a cinema with his father. Politically, Dritan had been a member of Albania's Democratic Party ("DP") since February 1992. Rather than maintain separate spheres for business and politics, Dritan allowed the two aspects of his life to complement each other; when he was not working, he volunteered his taxi services as a chauffeur for local DP officials and opened his cinema doors to host DP meetings. Furthermore, he participated in party meetings and distributed literature encouraging people to vote.

Dritan testified that his political activism made him the target of abuse on several different occasions. The first incident occurred in 1987 while Dritan was a high school student. Dritan

---

[4] Ranola also presented testimony generally corroborating Dritan's account.

opposed Albania's Communist government, and while talking with friends one day, he expressed his belief that the state's policy of forcing students to work on the weekends was "not right." When authorities learned of his comments, Dritan was pulled out of school, taken to the local police station, and beaten. Thereafter, he was not permitted to return to school and was forced to complete his education through night classes.

The next incident did not occur until March 1997 while he was helping the DP prepare for upcoming elections. While driving home from a party rally in Permet one night, he was stopped by a group of men wearing masks and wielding automatic rifles. Dritan immediately recognized two of the men as members of the local branch of the Socialist Party, which he believed to be the successor of the former Communist regime. The armed men forced Dritan from the car, levied insults at him, beat him, threatened him with the guns they carried, and stole his car. Although Dritan was eventually able to recover the vehicle, it was abandoned twelve miles away and heavily vandalized. Following this attack, Dritan went to live with his uncle some six hours away. However, he still managed to return to Permet in time to participate in elections held in June 1997.

Dritan further testified that in June 1999, as elections approached in October, members of the Socialist Party searched his home, threatened him, and damaged his cinema to such an extent that

he chose to cease operating it as movie theater. However, the cinema continued to be used to host DP meetings. Then in September of 2000, several men came to the Vakas' home, threatened the family, and physically abused Dritan. As evidence of the severity of the attack, Dritan testified that he received care at the local hospital for a cut above his eye. Additionally, the assailants fatally shot the family dog as they left the home.

Although he continued to work during the day, Dritan claimed that he no longer went out at night as a result of these incidents. However, he remained in Albania through the elections of October 2000 and into November, when he and his family finally left the country permanently. Traveling with valid Albanian passports personally issued to both Dritan and Ranola some six or seven years earlier, the Vakas first traveled to Greece, then Italy, then France. In France they obtained false Greek documentation and used it to travel to Belgium, then Spain, and finally Mexico. From Mexico the Vakas crossed into the United States illegally, apparently sometime around December 2000. Once in the United States, the Vakas joined Dritan's brother, a naturalized United States citizen, and Dritan's parents.

Following the hearing of March 5, 2004, the IJ issued her decision. The IJ found that Dritan and Ranola had testified credibly and that Dritan "has been harmed in the past on account of his political activities." Emphasizing this point in reference to

the 1997 car theft, the IJ specifically stated, "The Court wants to make a finding that these actions could not have been motivated for criminal intents since nothing was stolen." Despite these conclusions, the IJ held that the Vakas were not eligible for asylum. In making this determination, the IJ relied on several distinct lines of reasoning.

First, the IJ suggested that the Vakas' real motivation for coming to the United States may have been to reunite with family, rather than escape persecution. The IJ noted that the family apparently had the option of remaining in Greece with Dritan's sister who lives and works there. The Vakas could also have sought protection in any number of western European countries. Highlighting this point, the IJ pointed out that Dritan could have fled ever since his Albanian passport was first issued in 1993 or 1994,[5] but instead remained in Albania in order to make arrangements to travel to the United States.

Second, the IJ suggested that the degree of harm and the nature of risk experienced by Dritan were not severe enough to trigger asylum eligibility. The IJ noted that the attacks and threats only occurred sporadically. Furthermore, Dritan was not

---

[5] By the court's calculation, this would have been when Dritan and Ranola received their Albanian passports. Although the original documents were never presented before the IJ, Dritan testified that they had received the passports some six or seven years prior to the departure from Albania. The IJ accepted this assertion as true and cited the testimony in her decision.

prevented from working or owning property and, even after the final assault, he continued to participate in the DP and hold meetings at his cinema. The IJ also pointed to the fact that the Vakas did not leave Albania until two months after the last incident of abuse.

Third, the IJ noted "the fact that conditions appear to be improving in Albania" and recognized the presence of "general improvements" regarding levels of electoral violence. The decision also noted that the Country Report for Albania, issued by the State Department in 2003, indicated that conditions had "steadily improved." In sum, while the IJ recognized that elections have been plagued by problems in the past, that corruption persists, and that human rights abuses still occur in Albania, the IJ found it probative that the political process was becoming less irregular.

Thus, the IJ denied the Vakas' application for asylum, holding "the risk of harm does not rise to the well-founded standard." With their asylum claim denied, the IJ granted the Vakas voluntary departure from the United States, in lieu of removal. The Vakas then filed a timely appeal to the BIA, which affirmed the IJ's decision on November 8, 2005. Without elaborating, the BIA concurred in the IJ's conclusion that "[a]lthough the lead respondent experienced past harm on account of his political opinion, we agree that this mistreatment does not rise to the level of persecution." Therefore, the BIA found that the Vakas failed to meet their burden and issued an order denying

their appeal. Pursuant to the IJ's ruling, the BIA further ordered the Vakas to voluntarily depart the United States within 60 days or be subject to removal. The Vakas now petition this court for review of the BIA's decision.

## II. Discussion

### A. Applicable Law

Under the INA, the Attorney General has the authority to grant asylum to any individual who qualifies as a refugee. 8 U.S.C. § 1158(b)(1)(A).[6] The INA defines "refugee" as an individual who is unable or unwilling to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Government regulations interpreting the INA provide two separate avenues by which an alien may establish the he or she qualifies as a refugee: 1) by showing a well-founded fear of future persecution; or 2) by showing the existence of past persecution, thereby raising a regulatory presumption of a well-founded fear of future persecution. See Palma-Mazariegos v. Gonzáles, 428 F.3d 30, 34 (1st Cir. 2005); 8 C.F.R. § 208.13(b)(1)-(2).

---

[6] Following the reorganization of the INS that occurred after the creation of the Department of Homeland Security, the INA was amended to give the Secretary of Homeland Security the authority to grant asylum as well. See 8 U.S.C. § 1158(b)(1)(A).

In order to demonstrate a well-founded fear of future persecution, the asylum applicant must meet subjective and objective elements; that is the fear of persecution must be both genuine and objectively reasonable. See Palma-Mazariegos, 428 F.3d at 35. Additionally, a well-founded fear of future persecution requires "a reasonable possibility of suffering such persecution if [the applicant] were to return to [his or her] country," and the anticipated persecution must be committed because of one of the five statutorily protected grounds. 8 C.F.R. § 208.13(b)(2).

As noted, an alien also may become eligible for asylum by showing that he or she has suffered from past persecution. 8 C.F.R. § 208.13(b). As with the fear of future persecution, the past persecution must have been committed on the basis of one of the five protected grounds. 8 C.F.R. § 208.13(b)(1). Once the asylum applicant has demonstrated past persecution, a presumption of a well-founded fear of future persecution also arises. Id. However, the Government may rebut this presumption by establishing that changed country conditions have removed the threat of persecution or by demonstrating that the alien can safely relocate within his or her native country without fear of further persecution. 8 C.F.R. § 208.13(b)(1)(i).

Although federal regulations provide a coherent structure for the adjudication of asylum claims once the existence of past persecution or the likelihood of future persecution is determined,

they provide little insight as to what sort of conduct actually constitutes "persecution." See generally 8 C.F.R. § 208.13. Thus, the INA and INS regulations largely leave the exact import of the term to be determined by judicial exposition. See Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000). To that end, the case law of this circuit indicates that proving the existence of persecution is a fairly difficult burden to meet. See Guzmán v. INS, 327 F.3d 11, 15 (1st Cir. 2003). We have held that the fact that an alien has endured some physical abuse does not necessarily mean that the incident should be classified as "persecution," even when the abuse is suffered because of one of the five protected grounds. See id. at 16 (finding that a "one-time kidnaping and beating falls well short of establishing 'past persecution'"); Nelson v. INS, 232 F.3d at 264 (finding that substantial evidence supported an IJ's ruling that three incidents of detainment lasting less than 72 hours each, all accompanied by some physical abuse, did not rise to the level of persecution); Ravindran v. INS, 976 F.2d 754, 756-60 (1st Cir. 1992) (finding no persecution where a member of a minority ethnic group had been interrogated and beaten for three days in prison and warned about pursuing political activities).

To qualify as persecution, the harm suffered must represent more than "episodic violence or sporadic abuse." Palma-Mazariegos, 428 F.3d at 37. Furthermore, the nature of the harm "must rise above unpleasantness, harassment, and even basic

-10-

suffering."  Nelson, 232 F.3d at 263.  Beyond these few guiding principles, however, whether particular conduct constitutes persecution must be determined on an ad hoc basis.  See Aquilar-Solís v. INS, 168 F.3d 565, 570 (1st Cir. 1999).

We review the BIA's denial of asylum under the deferential substantial evidence standard.  Lan Zhu Pan v. Gonzáles, 445 F.3d 60, 61 (1st Cir. 2006).  The BIA's decision passes muster under this standard if "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  INS v. Elías-Zacarías, 502 U.S. 478, 481 (1992).  However, if "the record evidence would compel a reasonable factfinder to make a contrary determination," we are obliged to overturn the holding.  Aquilar-Solís, 168 F.3d at 569.  Since we are not compelled to reach a conclusion contrary to the decision promulgated below, we affirm the BIA's order.

## B.  **Past Persecution**

First, we believe substantial evidence exists to support the BIA's conclusion that Dritan's experiences did not rise to the level of past persecution, even though he suffered some harm because of his support for the DP.  The mere existence of politically motivated abuse, though deplorable, does not necessarily indicate that persecution has taken place.  See Guzmán, 327 F.3d at 15.  As noted, "episodic violence or sporadic abuse" does not reach the level of past persecution.  Palma-Mazariegos,

-11-

428 F.3d at 37. The three incidents in which Dritan suffered harm as a result of his affiliation with the DP could be fairly characterized as episodic and sporadic, having occurred over the course of three and a half years and each separated by at least fourteen months.

As the IJ also noted, Dritan continued to work and openly supported the DP for the duration of the alleged persecution.[7] According to his own testimony, he was not deterred from voting in elections in 1997, 1999, or 2000. Furthermore, even after his family was threatened and his cinema damaged, he continued to host DP meetings. Thus, despite the occasional episodes of physical abuse, Dritan was largely able to continue participating in both

---

[7] The BIA appears to have implicitly adopted this rationale when it affirmed the IJ's holding, writing, "Although the lead respondent experienced past harm on account of his political opinion, we agree that this mistreatment does not rise to the level of persecution." When the BIA defers to or adopts the decision of the IJ, a court of appeals must then directly review the decision of the IJ. Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003). This also seems to be permissible when the BIA offers only "a brief explanatory order," as is the case here. Settenda v. Ashcroft, 377 F.3d 89, 94 & 98 (1st Cir. 2004) (performing a substantial evidence review of the IJ's decision under these circumstances). Moreover, as the Government points out in its brief, there is some indication in the INS's explanation of its own regulations that the courts of appeals should be somewhat more open to reviewing the IJ when the BIA decision is issued by a single Board member, as is also the case here. See Board of Immigration Appeals: Procedural Reforms to Improve Case Management, Part III, 67 Fed. Reg. 54,878, 54,886 (Aug. 26, 2002) (suggesting as an example that when a single-member BIA decision adopts the IJ decision but with specific modifications, "any reviewing court would be able to look to the combination of the immigration judge's opinion and the single-member decision to understand the conclusions reached in the adjudication").

his professional and political life.  Although we do not seek to minimize the severity of the Vakas' experiences, we are not compelled to find that the harm suffered by Dritan rose to the level of persecution.

### C. <u>Well-Founded Fear of Future Persecution</u>

Since the Vakas failed to establish past persecution, they are not entitled to the regulatory presumption of a well-founded fear of future persecution. <u>See</u> 8 C.F.R. § 208.13(b)(1). Nevertheless, they are still afforded the opportunity to demonstrate such a fear by direct evidence. <u>See</u> <u>Palma-Mazariegos</u>, 428 F.3d at 34.  For the following reasons, we conclude that substantial evidence supports the BIA's conclusion that Dritan failed to show he possessed a well-founded fear of future persecution should he return to Albania.

First, substantial evidence existed to support the finding that any fear of future political persecution was not objectively reasonable because of changed country conditions within Albania.  At the hearing before the IJ, the Government introduced two State Department documents on conditions in Albania, the 2003 Country Reports on Human Rights Practices ("Country Report"), and the 2001 Profile of Asylum Claims and Country Conditions ("Profile") for Albania. United States Department of State, Bureau of Democracy, Human Rights, and Labor, <u>Albania: Country Reports on Human Rights Practices - 2003</u>, (2004); United States Department of

State, Bureau of Democracy, Human Rights, and Labor, <u>Albania:</u> <u>Profile of Asylum Claims and Country Conditions</u> (2001). The documents tend to show that changed country conditions within Albania are such that asylum-seekers may no longer have a well-founded fear of future persecution based on their political opinion. For example the Profile states, "elections held in October 2000 made clear and unmistakable progress toward meeting democratic standards." Notably, these were the last elections in which Dritan participated, as the family left the country only a month afterward. The Country Report describes a similar trend continuing through the elections of October of 2002, stating "[o]verall, the municipal elections were a major step forward, with good performances by the police, many local election officials, and electoral institutions." Admittedly, the Country Report also describes ongoing human rights violations and systematic deficiencies in the political process. Still, the general tone of the Report is that of a continuously improving political atmosphere.

The Vakas fault the IJ's reliance on these documents, citing the Seventh Circuit's observation that the State Department "softpedals human rights violations by countries the United States wants to have good relations with." <u>Gramatikov</u> v. <u>INS</u>, 128 F.3d 619, 620 (7th Cir. 1997). However, the Vakas offer no reason why the State Department's views on Albania in particular should be

-14-

viewed with skepticism. Furthermore, this circuit has stated that the State Department's country reports "are generally probative of country conditions." Palma-Mazariegos, 428 F.3d at 36. Despite the Vakas' assertions, the Country Report may "outweigh[] the petitioner's conclusory assertions of continuing danger . . . ." Aguilar-Solís, 168 F.3d at 572-73. Therefore, we believe substantial evidence was present for the BIA to conclude that a well-founded fear of future persecution did not exist, even though Dritan had testified credibly regarding the past incidents of abuse.

Second, substantial evidence supports a finding that Dritan's alleged fear was not subjectively genuine. As noted by the IJ, it is quite possible that the Vakas' relocation was motivated by a desire to come to the United States rather than a wish to flee Albania. The Vakas passed through Greece, Italy, France, Belgium, Spain, and Mexico without seeking asylum, instead insisting on continuing on to the United States. They even went as far as obtaining fraudulent identification in order to leave France and continue their journey. The fact that Dritan's brother and parents already reside in this country further supports the conclusion that the Vakas may have had an ulterior motive for leaving Albania. As the Profile warns, "[a]djudicators should explore all the motivations an applicant might have for requesting asylum, including family members already present in the United

-15-

States . . . ." Finally, the family's continued presence in Albania for two months after the last assault on Dritan further undermines their allegation of a genuine fear. Thus, substantial evidence existed for the BIA to adopt the IJ's holding that Dritan failed to meet his burden of proving a well-founded fear of future persecution.

## C. **Withholding of Removal and CAT**

Whereas asylum eligibility only requires an alien demonstrate a well-founded fear of future persecution, 8 U.S.C. § 1101(a)(42)(A), withholding of removal requires an alien to show that "it is more likely than not that he or she would be persecuted," 8 C.F.R. § 208.16(b)(2). In recognition of the fact that the standard for withholding of removal is more stringent than the standard for asylum, we have held that "a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the [standard for withholding of removal]." Mediouni v. INS, 314 F.3d 24, 27 (1st Cir. 2002) (citations and internal quotation marks omitted). Since the Vakas failed to established asylum eligibility, their claim for withholding of removal must also be denied.

In regard to the Vakas' CAT claim, their brief offers no developed argumentation as to why they qualify for relief.[8] Nor

---

[8] After briefly explaining the law, the Vakas simply state, "the Vakas should be granted withholding of removal under Article III of the Convention Against Torture since there is a clear probability

did they sufficiently raise the issue before the BIA.  In holding with well-established principles of appellate review, issues not raised below are deemed waived, as are issues unaccompanied by developed argumentation.  See Ravindran v. INS, 976 F.2d 754, 761 (1st Cir. 1992) ("Issues not raised before the Board may not be raised for the first time upon judicial review of the Board's decisions."); Nikijuluw v. Gonzáles, 427 F.3d 115, 120 n.3 (1st Cir. 2005) (denying an asylum-seeker's CAT claim where the petitioner "devoted his appellate brief exclusively to his asylum claim and has failed to develop any argument supporting [his CAT claim]").  Thus, the Vakas' claims for withholding of removal and relief under the CAT were properly denied.

### III.  Conclusion

For the foregoing reasons, we find the BIA's conclusions supported by substantial evidence.  Therefore, we deny the petition for review and affirm the BIA's order.

**Affirmed**.

---

they will suffer torture if returned to Albania."  No explanation as to what the legal definition of "torture" is, or why the Vakas are likely to be subject to it, is given.

-17-